U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 OCT -8 P 12:45

CLERK
BY UW
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:26-cr-00013 |
| BRANDY JHANIEL PEREZ, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 68)

Pending before the court is Defendant Brandy Jhaniel Perez's motion to suppress physical evidence seized subsequent to an allegedly unlawful traffic stop. (Doc. 68.) Defendant argues that the motor vehicle stop violated the Fourth Amendment because officers lacked reasonable suspicion that Defendant had committed a traffic offense, because the stop was unlawfully prolonged, and because police failed to obtain valid consent for a canine search of the vehicle in which Defendant was a passenger. The government opposes the motion, arguing Defendant lacks standing to challenge the motor vehicle stop. Even if standing is found, the government asserts that the traffic stop was lawful and Defendant's flight from law enforcement was an intervening independent act of free will. Finally, the government contends that the traffic stop was not unnecessarily prolonged and no consent was required for the canine sniff of the vehicle because it was not a search.

Defendant is represented by Jeffrey Chabrowe, Esq., and Stephanie M. Greenlees, Esq. The government is represented by Assistant United States Attorney Nathanael T. Burris.

## I. Procedural Background.

Defendant is charged in a six-count Superseding Indictment with one count of conspiracy to distribute and to possess with the intent to distribute 500 grams or more of

cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(ii), and (b)(1)(C) (Count I); two counts of distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Counts II and III); one count of possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. § 2 (Count IV); and one count of carrying a firearm in furtherance of Count IV in violation of 18 U.S.C. §§ 924(c)(1)(A), (2) (Count VI).[1]

On July 13, 2026, Defendant moved to suppress all evidence obtained as a result of the traffic stop. (Doc. 68.) The government opposed Defendant's motion on August 10, 2026. (Doc. 72.) The court held an evidentiary hearing on the motion on September 8, 2026. Defendant requested additional time to file a reply to the government's response, which the government did not oppose. The court granted the motion, and Defendant filed a reply on September 11, 2026 (Doc. 78).

## II. Findings of Fact.

The court makes the following findings of fact by a preponderance of the evidence.

On August 24, 2025, around 1:38 p.m., the St. Albans Police Department ("SAPD") received an anonymous call:

> Speaker One: Dispatch.
>
> Speaker Two: Hi, I live at 6 Marcel Drive. We just had a cruiser come down a little bit ago, turn around, just a drive[-]by, but there's been lots of activity at 4 Marcel Drive lately with Brad and Jen Stott.
>
> Speaker One: Okay.
>
> Speaker Two: Just wanted to let you know that the tinted Connecticut [Nissan A]ltima just pulled in. Two [B]lack gentlemen got out and went in. Ummm. We're, I mean[,] just as neigh . . .
>
> Speaker One: Hello?

[1] Count V of the Superseding Indictment applies only to Defendant's co-defendant.

(Doc. 68 at 1.) The caller's voice trailed off mid-sentence. One week prior to the call, the SAPD had searched 4 Marcel Drive pursuant to a warrant for Bradley Stott and arrested him for a violation of an abuse protection order.[2]

According to his affidavit, by 1:51 p.m. on August 24, 2025, SAPD Sergeant Zachary Koch

> was informed that a female from 6 Marcel Drive within the [t]own of St. Albans reported drug activity that was occurring at 4 Marcel Drive within the [t]own of St. Albans. The female had reported a tinted Connecticut plated vehicle that had pulled into 4 Marcel Drive where two [B]lack males had exited and went inside.

*Id.* at 2.

At approximately 3:42 p.m., Sergeant Koch was traveling in a marked police cruiser at the intersection of Marcel Drive and Lebel Drive en route to 4 Marcel Drive to investigate drug activity at that location when he saw a black Nissan Altima with Connecticut registration (the "Nissan") exit Lebel Drive. He "observed that the [Nissan's] windows were fully tinted[,] including the front windshield and front driver and passenger windows[,]" *id.*, in violation of 23 V.S.A. § 1125, which prohibits tinted vehicle windshields and windows, with limited exceptions.[3]

Sergeant Koch initiated a traffic stop of the Nissan in which Defendant was a passenger. Defendant asserts that Sergeant Koch "called for the canine unit immediately[,]" *id.*, while the government claims that SAPD Corporal Tyler Camilleri, an officer in the canine unit, "responded as backup to [Sergeant] Koch's stop of the Nissan on his own volition, without any request from [Sergeant] Koch for a [canine] or even for

[2] Although the government "does not dispute the facts set forth by [Defendant]," (Doc. 72 at 1), it sets forth additional facts regarding Defendant's alleged drug trafficking activities which are not included in Defendant's motion. *Id.* at 7 n.4. Because the government did not establish those facts, the court disregards them.

[3] Video footage confirms that the Nissan was fully tinted, including both the front driver and passenger side windows as well as the front and back windshields.

backup." (Doc. 72 at 2 n.2.) Corporal Camilleri's affidavit states that "he went to the traffic stop after receiving [Sergeant] Koch's message by radio."[4] (Doc. 68 at 3.)

At approximately 3:43 p.m., Sergeant Koch approached the Nissan and began speaking with its driver, Jose Coiscou-Mercedes. He observed that both Mr. Coiscou-Mercedes and Defendant were Black males. He told them that they were stopped because of the vehicle's tinted windows. Mr. Coiscou-Mercedes advised Sergeant Koch that the Nissan was a rental, and Defendant provided Sergeant Koch with the name of the rental company, located in Waterbury, Connecticut. There was a brief discussion of whether Connecticut law or Vermont law applied. Mr. Coiscou-Mercedes claimed Connecticut law allowed tinting. Sergeant Koch responded that Vermont law applied and prohibited the tinted windows.

Sergeant Koch asked the vehicle's occupants for their identification. He avers that he did so because of the Nissan's tinted windows, although he also noted the vehicle was a Nissan Altima with Connecticut plates that matched the description provided by the female at 6 Marcel Drive. Mr. Coiscou-Mercedes did not have photo identification on his person. By looking through his cell phone, he was able to provide a photo of a document that indicated, "This is a temporary document not valid for identification purposes." (Doc. 72-1 at 6:55-7:00.) He looked further on his phone for a prior copy of an expired license with a photo. He had to check his phone several times to find an identification number, which was not visible in the photo on the expired license. Defendant also did not have identification on his person. He also obtained a photo of his identification from his phone.

At approximately 3:45 p.m., Sergeant Koch began to handwrite the information from the image of Defendant's identification from Defendant's phone. At approximately 3:47 p.m., he handwrote Mr. Coiscou-Mercedes's information. During this portion of the

[4] Video of the stop does not reveal whether Sergeant Koch requested backup or a canine unit. Sergeant Koch radioed twice while initiating the traffic stop, but there is no audio accompanying this portion of the video. (Doc. 72-1 at 00:00-25.)

stop, Defendant and Mr. Coiscou-Mercedes joked with Sergeant Koch. The conversation was courteous and casual in tone and content.

At approximately 3:51 p.m., Sergeant Koch finished writing down the information from Mr. Coiscou-Mercedes and Defendant. By that time, Corporal Camilleri and another police officer had arrived on the scene with a canine unit. After returning to his patrol car, Sergeant Koch told Corporal Camilleri that "it'll be a minute[]" and that he "smell[ed] marijuana coming out of the car" but acknowledged that the canine "ain't trained on marijuana." *Id.* at 8:56-9:05. He told Corporal Camilleri that he "can take a look. Give a chat with them[,]" *id.* at 9:06-10, and suggested Corporal Camilleri's canine conduct a sniff test around the Nissan. Corporal Camilleri began to respond that he does not "typically" but then asked Sergeant Koch if he was "still rolling?" *Id.* at 9:30-32. Sergeant Koch stated that he was, and Corporal Camilleri replied that he will tell him something "after." *Id.* at 9:33-34. Sergeant Koch informed Corporal Camilleri that there was a "possible drug thing going [on]" related to the Nissan.

At approximately 3:52 p.m., Sergeant Koch commenced entering Mr. Coiscou-Mercedes's and Defendant's information into the database in his cruiser. While he did so, Corporal Camilleri walked over to the Nissan. He introduced himself to the occupants and told them that he would be "running a canine around the exterior" of the Nissan. (Doc. 72-2 at 0:35-38.) Upon being asked by Defendant what probable cause he had to do so, he replied that "[y]ou don't need probable cause in the state of Vermont to run the dog around the car." *Id.* at 0:42-46. At 3:53 p.m., Corporal Camilleri asked Mr. Coiscou-Mercedes and Defendant to roll up the Nissan's windows so that the "dog doesn't jump in or attack you guys or anything like that." *Id.* at 0:48-51. Mr. Coiscou-Mercedes or Defendant asked Corporal Camilleri an inaudible question, to which Corporal Camilleri responded, "Yeah, would you guys mind if that's okay? Um, I'll do it really quick and then I'll move on, okay?" *Id.* at 0:52-56. Neither Defendant nor Mr. Coiscou-Mercedes appeared to respond verbally. Corporal Camilleri then returned to his patrol car to retrieve the canine.

At approximately 3:54 p.m., Sergeant Koch asked over the radio for a colleague to run Mr. Coiscou-Mercedes's and Defendant's information with other state systems, specifically New York. He continued to enter and check information in the system until approximately 3:55 p.m., whereupon Mr. Coiscou-Mercedes and Defendant drove off from the scene in the Nissan at a high rate of speed. Mr. Coiscou-Mercedes was operating the vehicle. Sergeant Koch immediately pursued the Nissan, putting on his seat belt while driving. After a brief pursuit, the Nissan came to a stop. Mr. Coiscou-Mercedes and Defendant exited the Nissan and fled on foot into a field, chased by Sergeant Koch. They did not immediately respond to Sergeant Koch's commands to stop and surrender. He ultimately threatened to shoot them if they did not comply with his commands. Defendant and Mr. Coiscou-Mercedes were arrested at 4:01 p.m. A police officer requested the Nissan be secured.

Upon Defendant's arrest, Sergeant Koch asked Defendant if he could reach into his pocket. Defendant consented. Sergeant Koch found a small bag of powder in Defendant's pocket. Police officers searched the path along which Mr. Coiscou-Mercedes and Defendant fled and discovered a semi automatic 9-mm handgun (the "Firearm"). Corporal Camilleri conducted a canine search of the Nissan, during which the dog purportedly alerted for illegal drugs. The Nissan was subsequently seized, and police recovered an additional firearm, ammunition, a large amount of U.S. currency, and controlled substances.

## III. Conclusions of Law and Analysis.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him [or her] to a search or seizure. Once the defendant has shown a basis for his [or her] motion, the burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth Amendment." *United States v. Alleyne*, 573 F. Supp. 3d 861, 869 (E.D.N.Y.

2021) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (internal quotation marks omitted)).

**A. Whether Defendant Has Standing to Challenge the Search of the Nissan and Seizure of the Firearm.**

Defendant asserts that he "never indicated any intent to abandon his privacy interest" in the Nissan and that his abandonment of the Nissan and the Firearm stemmed from the alleged unlawful stop and should be suppressed as fruit of the poisonous tree. (Doc. 78 at 3.) The government counters that in fleeing, Defendant "forfeited any reasonable expectation of privacy" and thus lacks standing to challenge any subsequent seizure and search of the Nissan and any evidence derived from the traffic stop. (Doc. 72 at 2.)

In the context of the Fourth Amendment, standing "is not distinct from the merits and is more properly subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States*, 584 U.S. 395, 410 (2018) (citation and internal quotation marks omitted). "[R]ights assured by the Fourth Amendment are personal rights, and . . . they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Jones v. United States*, 362 U.S. 257, 260-61 (1960)).

The parties do not contest that Defendant, as a passenger in the Nissan, initially had a reasonable expectation of privacy in the vehicle and its contents. *See Arizona v. Johnson*, 555 U.S. 323, 332 (2009)). The question is whether, in fleeing and exiting the Nissan and discarding the Firearm, he abandoned any privacy interest associated with those objects.

"[A] warrantless search or seizure of abandoned property does not violate the [F]ourth [A]mendment" because "one forfeits any reasonable expectation of privacy upon abandoning one's property[.]" *United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987). Abandonment is "a question of fact, to be decided in objective terms on the basis of all the relevant facts and circumstances[.]" *Id.* Although "an abandonment must be voluntary, the existence of police pursuit or investigation at the time of abandonment

does not of itself render the abandonment involuntary." *United States v. Ellis*, 2021 WL 3667867, at *3 (W.D.N.Y. Mar. 9, 2021) (internal quotation marks omitted) (quoting *United States v. Morgan*, 936 F.2d 1561, 1570 (10th Cir. 1991)).

The Second Circuit has not squarely decided whether an illegal stop precludes a subsequent abandonment of property as a matter of law. Some courts, however, have found an abandonment to be coerced, and therefore involuntary, when directly precipitated by an unlawful seizure. *See, e.g., United States. v. Arenas*, 37 F. Supp. 2d 322, 330 (S.D.N.Y. 1999) ("[T]he precise moment at which the individual relinquishes the property is critical. Indeed, where it is determined that the alleged relinquishment of the property at issue occurred after an illegal search or seizure of the person, the individual's actions in response to the illegal search or seizure cannot be deemed to be an abandonment of the illegally obtained property[.]"); *United States v. Coggins,* 986 F.2d 651, 244-45 (3d Cir. 1993) (Where "the abandonment of property is precipitated by an unlawful seizure, that property . . . must be excluded[]"); *United States v. Beck*, 602 F.2d 726, 730 (5th Cir. 1979) ("[I]t would be sheer fiction to presume . . . [the acts of abandonment] were caused by anything other than the illegal stop.").

In contradistinction, courts have uniformly concluded that a defendant who abandons vehicles or items while fleeing a *lawful* traffic stop has forfeited any expectation of privacy in the abandoned property. For example, in *United States v. Lynch*, Pennsylvania police pulled over the defendant after observing that the tinted windows on his vehicle were not in compliance with the Commonwealth's Vehicle Code. 290 F. Supp. 2d 490 (M.D. Pa. 2003). The court determined that the stop was supported by an articulable and reasonable suspicion of criminal activity and, therefore, the defendant "could not have any reasonable expectation that the vehicle or its contents would be free from governmental intrusion[]" after fleeing on foot. *Id.* at 495, 497; *see also United States v. Clarke*, 1993 WL 478374, at *2 (S.D.N.Y. Nov. 12, 1993) ("[D]efendants' flight from their vehicle after very brief valid questioning constituted a voluntary abandonment, not coercion, and the ensuing search of the vehicle was lawful[]"); *United States v. Harvey*, 2022 WL 16579328, at *8 n.6 (N.D. Ga. Oct. 7, 2022) (holding defendant

"abandoned any interest in [his] truck by fleeing from the scene of the lawful traffic stop").

Whether Defendant has standing to challenge the seizure of the Nissan and Firearm therefore turns on whether the initial traffic stop was lawful and, if not, how soon thereafter the Nissan was abandoned. The court thus addresses the lawfulness of the stop before resolving the issue of standing. *See Byrd*, 584 U.S. at 411 ("Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits[.] ").

**B. Whether the Traffic Stop Violated the Fourth Amendment.**

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (citations omitted). As a result, "traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which 'requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity.'" *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (quoting *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009)).

**1. Whether There Was Reasonable Suspicion of a Traffic Violation.**

Defendant argues that the stop of the Nissan was unsupported by reasonable suspicion or probable cause because it was pretextual in nature. As the government points out, a pretextual stop is not unlawful under federal law.

"[T]he requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment[.]'" *New Jersey v. T.L.O.*, 469 U.S. 325, 346 (1985) (quoting *Hill v. California*, 401 U.S. 797, 804 (1971)). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than

proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause[.]" *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal citations and quotation marks omitted).

Reasonable suspicion must be based on specific and articulable facts, as viewed through the lens of an experienced law enforcement officer. *See United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020). When assessing reasonableness, "it is imperative that the facts be judged against an objective standard[.]" *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Courts must therefore ask whether "the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief that the action taken was appropriate[.]" *Id.* at 21-22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925); *Beck v. State of Ohio*, 379 U.S. 89, 96-97 (1964)).

At the September 8, 2026 hearing, Defendant asserted that the anonymous August 24, 2025 phone call, rather than the tinting on the Nissan's windows, was the true basis for the traffic stop. (Doc. 77 at 10:6-11.) Fourth Amendment analysis, however, does not take into consideration the subjective reasoning or motivation of the officer making the stop. *See Whren*, 517 U.S. at 806-07; *see also United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) ("If an officer has observed a traffic violation, his [or her] actual motivation for stopping the vehicle is irrelevant to whether the stop is constitutionally reasonable."); *United States v. Miller*, 439 F. Supp. 3d 91, 98 (E.D.N.Y. 2020) ("A pretextual traffic stop . . . presents no constitutional issue, so long as the stop itself is supported by reasonable suspicion."). Sergeant Koch's actual motives for initiating the stop are thus irrelevant.

Defendant alternatively argues that the stop of the Nissan was unlawful because Sergeant Koch never measured the degree of tinting on the Nissan's windows or where it was located to conclude that it violated 23 V.S.A. § 1125, which provides in relevant part:

> Obstructing windshields, windows
>
> (a) Except as otherwise provided in this section, a person shall not operate a motor vehicle on which material or items have

> been painted or adhered on . . . any transparent part of a motor vehicle windshield, vent windows, or side windows located immediately to the left and right of the operator. . . .
>
> (b) Notwithstanding subsection (a) of this section, a person may operate a motor vehicle with material or items painted or adhered on . . . the windshield, vent windows, or side windows:
>
> (1) in a space not over four inches high and [twelve] inches long in the lower right-hand corner of the windshield;
>
> . . .
>
> (3) in a space not over two inches high and two and one-half inches long in the upper left-hand corner of the windshield[.]

23 V.S.A. § 1125.

The degree of tinting is immaterial to a violation of 23 V.S.A. § 1125 because any degree of tinting is prohibited under § 1125(a). Moreover, based on the video of the stop, it is clear that the Nissan's windows and front and rear windshields were fully tinted in violation of § 1125(a), and therefore no measurements were needed. The initial traffic stop was supported by reasonable suspicion and was lawful under the Fourth Amendment.[5]

### 2. Whether the Stop Was Unreasonably Prolonged.

Defendant asserts that even if the initial traffic stop was lawful, Sergeant Koch impermissibly prolonged the vehicle stop to allow Corporal Camillieri to conduct a drug investigation through the use of a drug-sniffing canine. The government responds that "the duration of the stop was largely the result of the fact that neither [Defendant] nor [Mr. Coiscou-Mercedes] had a driver's license or other identification on their person" and that there was probable cause to commence a drug investigation. (Doc. 72 at 7, 7 n.4.).

---

[5] At the September 8, 2026 hearing, counsel for the Defendant conceded that the Nissan's tinting violated Vermont law and was a "legitimate reason for stopping the car." (Doc. 77 at 13:12-13.)

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In the context of a traffic stop, "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (quoting *Caballes*, 543 U.S. at 407) (first, second, and third alteration in original).

Citing *Rodriguez*, Defendant argues that "the officer's authority to detain and question the driver is limited by the purpose of the stop; specifically, the officer is authorized to address the traffic violation that warranted the stop and attend to related safety concerns." (Doc. 68 at 6.) Although the *Rodriguez* Court held that an "otherwise-completed" traffic stop may not be unreasonably prolonged, police officers may constitutionally prolong a stop upon discovery of circumstances that give rise to an independent reasonable suspicion. *Rodriguez*, 575 U.S. at 353, 355; *see also United States v. Jenkins,* 452 F.3d 207, 214 (2d Cir. 2006) (holding officers may continue to detain a vehicle and its occupants if they "detect[] an independent basis" for further investigation).

In this case, the traffic stop lasted approximately twelve minutes before Defendant and Mr. Coiscou-Mercedes fled the traffic stop and led law enforcement on a high-speed chase. Mr. Coiscou-Mercedes's and Defendant's lack of identification on their persons required Sergeant Koch to spend approximately eight minutes handwriting their information before returning to the patrol car to check for "outstanding warrants[,]" a task within a traffic stop's "mission[.]" *Rodriguez*, 575 U.S. at 355. Once in the patrol car, Sergeant Koch diligently entered and reviewed the information provided him and checked various databases, as was permissible. *See id.* (a police officer may make "ordinary inquiries incident to the traffic stop[,]" and "[t]ypically such inquiries involve checking the driver's license [and] determining whether there are outstanding warrants against the driver") (alteration omitted); *see also Sakoc v. Carlson*, 2012 WL 3929904, at *8 (D. Vt. Sept. 10, 2012) ("In connection with a valid traffic stop, a police officer may

request a driver's license and vehicle registration, run a computer check, and issue a citation.") (citation and internal quotation marks omitted). There was no unreasonable delay in this lawful process.

Defendant contends that Sergeant Koch had already finished entering Defendant's and Mr. Coiscou-Mercedes's information as of 3:53 p.m. and that the canine sniff prolonged the stop by approximately two minutes until Defendant and Mr. Coiscou-Mercedes fled at 3:55 p.m. (Doc. 78 at 2-3.) The video of the stop, however, reveals that Corporal Camilleri merely discussed a canine sniff test while Sergeant Koch was still conducting tasks related to the traffic stop and communicating with dispatch at 3:54 p.m. to run Defendant's and Mr. Coiscou-Mercedes's information in other databases, including New York's. Doc. 72-1 at 11:30.[6] Sergeant Koch was in the process of obtaining that information when the Nissan fled the scene with Mr. Coiscou-Mercedes driving. *Id.* at 13:10. This was therefore not an "otherwise-completed" stop. *Rodriguez*, 575 U.S at 353.

Assuming *arguendo* that the stop had been prolonged beyond its completion to commence a canine search, Sergeant Koch's detection of the scent of marijuana provided an independent basis for lengthening the stop. *See Jenkins*, 452 F.3d at 214 (having detected the odor of marijuana, officers had "a particularized and objective basis for suspecting legal wrongdoing . . . and were justified in continuing the detention of the SUV and its occupants[]") (internal quotation marks and citation omitted).

Because Sergeant Koch did not unreasonably delay the traffic stop for a canine sniff, and because Defendant and Mr. Coiscou-Mercedes fled before the stop could be completed, the stop was not unconstitutionally prolonged. For this reason, the court need not determine whether reasonable suspicion or probable cause supported an investigation of drug trafficking activity.

---

[6] *See Scott v. Harris*, 550 U.S. 372, 378, 380-81 (2007) (ruling that where a videotape conflicts with defendant's version of events, and there are no allegations or indications that it was "doctored or altered in any way," the videotape prevails).

### 3. Whether Defendant's Consent to Canine Search Was Invalid Because Corporal Camilleri Misrepresented That Defendant Did Not Have a Right to Object.

Defendant argues that his apparent consent to the canine search was not valid because Corporal Camilleri's statement that he did not need probable cause to conduct a canine search was misleading and thereby rendered his consent by acquiescence involuntary. The government does not address this argument.

The use of a trained narcotics-detection canine "generally does not implicate legitimate privacy interests[]" such that it becomes a "constitutionally cognizable infringement[]" under the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). The Fourth Amendment therefore does not require that a canine sniff be supported by either reasonable suspicion, probable cause, or consent. Although Defendant argues that the Vermont Constitution provides broader protections than the Fourth Amendment to the United States Constitution, federal law applies. *See United States v. Brown*, 52 F.3d 415, 420 (2d Cir. 1995) (affirming district court's application of federal law in denying a motion to suppress which defendant argued would have been granted had Vermont law applied and holding that "federal law is applicable in a federal prosecution even when state police officers were involved in the case"); *see also United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987) ("[W]e are persuaded that federal law should apply to this federal criminal prosecution, even though the underlying investigation leading to prosecution was conducted solely by state officials[]").

Because the traffic stop was lawful in its inception and its execution, and because Defendant abandoned the Nissan as well as the Firearm during his flight, he lacks standing to challenge the seizure and subsequent search of those objects. His motion to suppress is therefore DENIED.

## C. Whether Defendant's Flight Was an Intervening Independent Act.

For appellate review, the court considers Defendant's challenge to the government's contention that any unlawful aspect of the traffic stop was purged by Defendant's subsequent flight.

"Evidence obtained as a result of the defendant's 'intervening independent act of free will' serves to 'purge the primary taint of the unlawful invasion.'" *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). Courts have found that evidence seized following a defendant's flight from an illegal stop is not subject to suppression because the flight was an intervening independent act of free will sufficient to break the causal chain between the unlawful conduct and seized evidence. *See, e.g.*, *United States v. Williams*, 608 F. Supp. 2d 325, 330 (E.D.N.Y. 2008) ("By breaking free of [the police officer's] grasp, [defendant] rendered the legality of that seizure an irrelevancy."); *United States v. Chin*, 859 F. Supp. 48, 51 (E.D.N.Y. 1994) ("The defendant's flight[] and subsequent violations of the law were not foreseeable, and constituted intervening acts free of the initial taint associated with the [unconstitutional] stopping of his vehicle[.]"); *United States v. Beauchamp*, 659 F.3d 560, 574 (6th Cir. 2011) ("[W]e have held that if a suspect's response to an illegal stop is a new and distinct crime, such as flight or use of force, any evidence recovered incident to the arrest for the subsequent crime is not tainted by the unlawfulness of the initial detention."). In doing so, however, courts have closely examined the nature and proximity of the flight to determine if it remains tainted by the illegal seizure.

In *United States v. Brodie*, the D.C. Circuit suppressed evidence despite the defendant's flight from an illegal *Terry* stop. 742 F.3d 1058 (D.C. Cir. 2014). There, the defendant was walking on a sidewalk when police officers approached him and ordered him to put his hands on a car. *Id.* at 1060. The defendant briefly complied but, "[a] few seconds later, he fled [on foot]. Before being caught, he jettisoned three weapons, and in a pat down the officers recovered crack cocaine." *Id.* The court opined that, "[a]s those events flowed directly from the seizure, . . . it is hard to spot any attenuation." *Id.* at 1063. It acknowledged that "[t]here are . . . a number of cases where courts have found attenuation in a defendant's response to illegal police conduct[,]" but distinguished those cases as ones where "the court found that the defendant had committed a new crime . . . or had at least fled in a manner posing serious risks to the public safety—typically a

vehicular flight leading to a high-speed car chase[.]" *Id.* (citations omitted). Observing that "Brodie fled on foot, and the manner of his flight in itself posed no incremental threat to anyone[,]" the court concluded that "the government ha[d] not met its burden to show attenuation between the illegal seizure and the discovery of the guns and drugs." *Id.* at 1063-64.

In contrast with the flight in *Brodie*, Defendant and Mr. Coiscou-Mercedes fled in a vehicle, posing a serious risk to public safety. At the September 8, 2026 evidentiary hearing, Defendant maintained that he had not "initiat[ed] the initial [vehicle] flight" and in fact was "absolutely not in favor of the driver taking off[.]" (Doc. 77 at 21:8, 22:11.) He thus argues that the vehicular flight was not an act of free will on his part. He contends further that he fled on foot only "a short distance" and in order to "mak[e] sure that he [was] in fact safe[.]" *Id.* at 22:2, 22:13-14; *see also United States v. Flintroy*, 30 F. Supp. 3d 616, 627 (W.D. Ky. 2014) (citing *Wong Sun*, 371 U.S. at 486) ("Generally, an intervening event includes an act of 'free will' by the defendant as opposed to events out of his control.").

As the video of the stop reveals, after the Nissan came to a halt, Defendant exited the car and ran a considerable distance from the roadside. In doing so, he failed to respond to lawful law enforcement commands that he stop his flight and surrender. In order to detain Defendant, Sergeant Koch had to cross over a bush, walk through a wooded area, and wade through tall grass. He obtained Defendant's compliance with his commands only after he threatened to shoot him. While the vehicular flight arguably was not an act of Defendant's free will, his decision to run from law enforcement, allegedly discarding a loaded firearm in the process, was an act of his own volition that posed an imminent and substantial risk to public safety. *See, e.g.*, *United States v. Moore*, 670 F.3d 222, 230 (2d Cir. 2012) ("[A] discarded gun obviously poses public safety considerations"); *see also United States v. Delima*, 2023 WL 6609328, at *4 (D. Vt. Oct. 10, 2023) (crediting officer's testimony that "an unaccounted-for firearm in a public space is an inherently dangerous thing.") (internal quotation marks omitted).

Because Defendant's "flight . . . [was] not foreseeable" as a result of the alleged police misconduct, it "constituted [an] intervening act[] free of the initial taint associated with the stopping of his vehicle[.]" *Chin*, 859 F. Supp. at 51. Consequently, any illegally seized evidence was purged of its allegedly unlawful taint by Defendant's intervening criminal act. *See United States v. King*, 2009 WL 10679741, at *5 (N.D. Ohio Nov. 4, 2009) ("[N]o evidence was seized from the [d]efendant prior to his flight from the scene of the initial traffic stop. . . . Accordingly, the evidence collected post-flight need not be suppressed based upon the illegality of the initial traffic stop[.]"). For this reason, assuming *arguendo* the traffic stop was unlawful, Defendant's motion to suppress would be denied on the basis of his subsequent flight.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress. (Doc. 68.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 8th day of October, 2026.

Christina Reiss, Chief Judge
United States District Court